## Case No. 9,666.

### MITCHELL v. McKIBBIN.

[29 Leg. Int. 412; 8 N. B. R. 548; 21 Pittsb. Leg. J. 77.] [1]

District Court, E. D. Pennsylvania. Nov., 1872.

BANKRUPTCY—EQUITY OF REDEMPTION — DEFEASIBLE CONVEYANCE—RIGHTS OF CREDITORS —SUIT BY ASSIGNEE.

1. The defendant, owning the lease, good-will, fixtures. furniture, and other contents, &c., of a profitable hotel, sold the same to his two sons, for a price equal to three-fifths only of the value, on a long credit payable in deferred instalments, bearing interest; and it was, at the same time, agreed between them that, on default in payment, the premises should, at the defendant's request, be reconveyed. Under this agreement his right of resumption was a mere security for the price, the transaction being the same, in effect, as if he had, on transferring the property and possession, received a mortgage from the sons for the price.

2. The form of words used was, in this respect, immaterial. An express provision that, in the event of default, the property should revest absolutely, without any equity of redemption, would not have been valid so as to debar the right of redemption, or foreclose it in advance.

3. If an exception from this rule were admissible, as between seller and buyer, in peculiar cases, the exception could not be admitted where the debt is of less amount than the value of the security, and the right of resumption is unilateral at the creditor's option, and is indefinitely protracted.

4. If this were otherwise the right of absolute resumption would not be exercisable on the debtor's insolvency, in derogation of the right of his other creditors to the benefit of the surplus in value, or equity or redemption.

5. After the purchase by the sons, the business of the hotel was continued by them in partnership, with great profit: but, through causes wholly extrinsic, they became, long after the last

---

[1] [Reprinted from 29 Leg. Int. 412, by permission. 8 N. B. R. 548. and 21 Pittsb. Leg. J. 77. contain only partial reports.]

instalment of the price fell due, insolvent. This was three years and four months after their purchase. They had not paid to the defendant, any part of the price; and were, on other accounts, both as partners, and each separately, indebted to him. On learning the state of their affairs, he demanded a return of the property; whereupon they, in professed execution of their former agreement, and in extinction of their debt for the price with its interest, made a retransfer to him. This retransfer was, in form, absolute. It was, in effect likewise, absolute, as between the parties to it.

6. Therefore, as against the sons themselves, it determined their equity of redemption, which had, until then, continued.

7. As against their creditors proceeding adversarily, the retransfer was wholly invalid, even as to the unpaid price, unless the actual and apparent possession was resumed, and retained by the defendant.

8. His resumption of the hotel was published in two daily newspapers of local general circulation; his name was substituted for the names of the sons on the register of guests, and at the heads of the bills rendered; new books of account, &c., were opened in his name; and the actual receipts and disbursements were by him. This, although one of the sons remained there, as a superintendent of the business, in the service of the defendant, was not an insufficient resumption and retention of possession by the defendant, if as full actual and apparent control as the nature of the subject reasonably admitted of, was fairly exercised by him. 14 P. F. Smith [64 Pa. St.] 352.

9. Although there was such a change of the possession sufficient as against creditors proceeding adversarily, yet the retransfer, having been made by the sons when insolvent, was invalid, as against such creditors, to such extent as the consideration may have, in part, been not valuable, but voluntary.

10. The property, when retransferred, was of considerably greater value than the debt for the price of the original sale, with interest. The consideration of the retransfer was not valuable, but voluntary, as to such excess in value.

11. In the absence of actual, as distinguished from constructive or legal fraud, the fact that a material part of the consideration was thus voluntary, did not preclude the defendant, so far as it was valuable, from asserting title under the retransfer, as against creditors proceeding adversarily.

12. He was entitled therefore, to retain the property, even as against such creditors, until he should receive payment in full of the debt for the price and interest, though as between the debtors and himself, it had been extinguished by his acceptance of the retransfer.

13. But, as the debtors were, at the time of the retransfer, insolvent, the property, subject to the defendant's right of repayment, was recoverable at the suit of such creditors, in equity; and so soon as he should be repaid in full, immediate possession was recoverable by such creditors under proper proceedings at law or in equity.

14. The defendant retained the property for some time, receiving from it profits of large amount, after which he sold out for a price exceeding considerably the amount of the original price with interest. The price at which he thus finally disposed of the property was a single entire consideration, unapportioned between the good will and the corporeal moveable effects. These effects and the good will were of about equal value. The amount of clear profits received by him since the retransfer, together with the value of the good will when the final disposition was made, exceeded the amount of the price of the original sale with interest. Two days before the defendant thus sold out, but more than six months after the retransfer, the survivor of the sons commenced, in this court, proceedings under which he was voluntarily adjudged a bankrupt; after which, the plaintiff, in the due course of these proceedings, became the assignee in bankruptcy; and subsequently sued the defendant in trover to recover the value of the corporeal effects. If the retransfer had otherwise been valid against creditors, and had been made invalid by the bankrupt law alone, the commencement of the proceedings in bankruptcy was here too late to enable the plaintiff, as assignee in bankruptcy, to set aside the defendant's title.

15. But the assignee in bankruptcy, representing the general body of the creditors, may sue adversarily on their behalf—where the bankrupt himself could not—to annul, or set aside, any act which, under the general law of debtor and creditor, is, in whole or in part, void or voidable as against creditors.

16. Whatever has been either actually or constructively fraudulent is thus void or voidable.

17. As to "all the property conveyed by the bankrupt in fraud of his creditors," the title of the plaintiff, as assignee, under the 14th section of the bankrupt act of the 2d of March, 1867 [14 Stat. 522], "related back" to the time of the commencement of the proceedings in bankruptcy. Therefore, if he could otherwise maintain the action, the defendant, who had not then disposed of the effects in question, could not apply the proceeds of the subsequent disposal of them in payment of any other demand which he may have had against the sons.

18. In the present action of trover the plaintiff could not recover more, in damages, than the value of the corporeal effects; nor could he recover to the amount of their value, unless they had been wrongfully converted by the defendant to his own use after the commencement of the proceedings in bankruptcy.

19. The only such conversion was the sale by which he finally disposed of the good will and the corporeal effects, together, for a single price. This would not have been such a conversion, if his relations had not then been adversary. The good will and corporeal effects could not have been sold separately without a sacrifice of each; and, as the debt rightfully secured to him was in part unpaid, the disposal of the whole together, by a single act, in order to effectuate the security, would not have been wrongful. In that case, the plaintiff's only recourse would have been for the surplus of the proceeds, for which he could not have sued in trover.

20. But if the defendant's possession of the whole was with assertion of exclusive right in himself, it was an adverse possession; and, if he sold with an existing intent and purpose to appropriate the whole avails to his own exclusive benefit, the sale, as made, was, it seems, a conversion such that the action of trover might be maintainable.

This was an action of trover, at the suit of James T. Mitchell, assignee in bankruptcy of Jeremiah McKibbin, surviving partner of the late firm of Jeremiah & William C. McKibbin, against their father Chambers McKibben, to recover the value of certain furniture and other effects in the Merchants' Hotel, in the city of Philadelphia.

Diehl & Archer, for plaintiff.
Sellers & Biddle, for defendant.

CADWALADER, District Judge (charging jury). The articles of agreement of 11th June, 1868, state that on February 1st, 1865, Chambers McKibbin was the owner of the lease and good will of the Merchants' Hotel, and of its furniture and fixtures of all kinds,

its bed and table linen, carriages and horses, and generally of its arrangements and appurtenances of every nature, for the transaction of the business of hotel keeping. At that time, February 1st, 1865, he was desirous of relinquishing the business in favor of his two sons, Jeremiah and William C. McKibbin. He deposes that the hotel was of the clear yearly value of from $15,000 to $20,000, and was worth $50,000 to a stranger, but that he was willing to dispose of it to them for $30,-000, and to receive payment out of the future profits, because they were his sons, and had been concerned with him in the business and in building up its good will and character, and also because he hoped that certain debts which they owed him might, if they prospered, be repaid. The sale was made accordingly for $30,000, payable in six instalments, of $5,000 each, one in twenty days, and the other five, which were to bear interest, in six, twelve, eighteen, twenty-four, and thirty months, respectively. For each of the six instalments they gave to him their promissory notes. Except these notes there was no writing executed. But the subsequent articles state that it was agreed at the time of the sale that, in the event of default in payment of the notes, the premises should, at his request, be reconveyed. He testifies to an express understanding, that if anything happened that they could not pay, they were to return the property to him; and Mr. Joseph McKibbin testifies, that in the event of their failure to pay their father, for his protection the agreement was, that the property should be retransferred. Jeremiah McKibbin also deposes, that there was an understanding of the same effect as that mentioned in the articles. We may therefore understand what occurred as having been expressed in the language of the subsequent articles.

Jeremiah and William C. McKibbin carried on the business from February 1st, 1865, till 11th or 16th of June, 1868. In this time, say three years and four and a-half months, the cash receipts were $665,802; and the whole expenditures, including rent, $537,691; the profits being $128,111,—more than $38,000 yearly, and about $3,200 monthly; but Jeremiah McKibbin thinks that the business of the last year was not so good by about 20 per cent. as that of the former period, so that for the last year we may assume that they were not less than $30,000. Of the profits, amounting to $128,111, Jeremiah McKibbin drew out $51,403, and William C. McKibbin $57,219; together, $108,622,—leaving between $19,000 and $20,000, nominally at least, in the concern, ($19,489.) They had, however, incurred other liabilities, not on the books, nor arising from the business of the hotel, to a considerable amount; they had not paid to their father a cent on account of the $30,000 purchase money, for which he held their notes; and they were each on separate account indebted to him in a large sum.

Here, I may observe, that their father's title to the property in dispute in this case cannot be in any wise benefited or improved by reason of any debt of either of them to him, except the notes for $30,000. The jury may dismiss from their minds every other debt to him. The father, in June, 1868, received information of their embarrassments; and learned from themselves that the information was true. He then demanded the return of the hotel property; and they agreed, as he says, to give it back. The articles of agreement of June, 1868, which I have already mentioned more than once, were accordingly prepared and executed, containing a brief recital of what had occurred in 1865, stating that the whole purchase-money remained due and unpaid, and, in consideration of the surrender of the promissory notes, and of the debts which they represented, and in pursuance of the agreement and understanding made at the time of the original purchase, purporting to sell and transfer to him the lease of the Merchants' Hotel premises, then held by them, together with the good will, fixtures, and appurtenances of the business then transacted in the hotel, and all and singular the furniture, bed and table linen, crockery ware, cutlery, horses and carriages, and generally all things for the transaction of the business of hotel keeping, to them belonging, and then to said premises and the business there transacted pertaining. This was, in form, an absolute transfer. What it was, in effect, as between the parties, and as against creditors, will be considered hereafter.

Mr. McKibbin, the father, conducted the business of the hotel until the 24th of May, 1869, between eleven and twelve months. What his receipts were, during this time, beyond the expenses, we do not know precisely. The bookkeeper could not tell, for a reason which the jury will recollect. Mr. McKibbin himself says, that the hotel was worth from $15,000 to $20,000 clear value every year. Jeremiah McKibbin testifies indistinctly. We know that the profits in the time of him and his brother had averaged $38,000. He says: "After the retransfer the business fell off about twenty per cent. I don't know, the books are here. I think the last year we were there the profits fell off about twenty per cent." Perhaps he means there was a two-fold falling off, first of twenty per cent. in their own last year, and again of twenty per cent. after the retransfer, say first to $30,000, and afterwards to $24,000. The lowest amount, on the father's own evidence, was not less than $15,000. On the 24th of May, 1869, he sold out the concern for $42,000. How much of this was the value of the furniture, and how much of the good will, is not precisely shown. The purchaser says, about half each, $21,000 furniture, and $21,000 good will. The furniture had been constantly insured, we are told, for $30,000; and therefore its value in the hotel was probably greater than $21,000. The purchaser seems to have made his estimate upon some notion of removing the fur-

niture. His valuation, though it may seem low, is, however, perhaps the safest estimate that we have in the evidence. But the whole subject of value is peculiarly one for the jury. William C. McKibbin died on the 3d of Oct., 1869; and on the 22d of May, 1869, two days before the elder Mr. McKibbin sold out, Jeremiah McKibbin, as surviving partner of J. and W. C. McKibbin filed his petition as a voluntary bankrupt. The title of the plaintiff, as assignee in bankruptcy, has relation to that day, that is to say, takes effect from the 22d of May, 1869. Representing the adversary rights of the general body of the creditors, he alleges that the sale by Mr. McKibbin on the 24th of May, 1869, was a wrongful conversion or disposition of the furniture and effects mentioned in the declaration to Mr. McKibbin's own use.

On behalf of the defendant I am requested to charge you:

1. That the transfer of June 11th, 1868, being more than six months previous to the filing of the petition in bankruptcy was not an act of bankruptcy. This proposition is affirmed.

2. That the transfer of June 11th, 1868, being valid by the laws of Pennsylvania, even though it preferred a creditor, the plaintiff in this case cannot recover unless the bankrupt has a beneficial interest in the goods, notwithstanding said transfer. This proposition is affirmed absolutely on the question of preference; and is otherwise affirmed throughout, except as it may be qualified, if the jury, under instructions hereafter to be given, shall find that the transfer, though absolute as against the debtors, was, under the general law of debtor and creditor, invalid as against creditors proceeding adversarily.

3. That if, at the time of said transfer, the defendant was a creditor of the bankrupt firm to an amount exceeding the value of the articles transferred, said transfer was valid, and the verdict should be for the defendant. This proposition is affirmed, if the value of the articles did not materially exceed the amount of the notes for $30,000, with interest.

4. That a transfer of the goods and chattels in 1868, vested the title and possession in the defendant legally, and the plaintiff cannot recover in a case founded on a tortious conversion. This proposition is affirmed, except so far as it may be qualified hereafter in the course of the charge to the jury.

5. That inasmuch as the plaintiff has in certain counts declared on a tortious conversion, and in other counts that there was a transfer in fraud of the bankrupt act, the verdict must be for the defendant. On this point the court instructs the jury that their verdict cannot, upon the evidence, be for the plaintiff upon any count of the declaration except the third;[2]

and further than this, refuses to give the instruction requested.

6. If the jury believe that the transfer of the property to Chambers McKibbin, was an honest transaction, made in pursuance of the original agreement to make such transfer in case of non-payment, and for a bona fide consideration, the verdict must be for the defendant. This proposition is affirmed except so far as it may be qualified through the distinction between actual, and legal or constructive fraud, which will be explained hereafter.[3]

If the assignee in bankruptcy, who is here plaintiff, had no better right than J. and W. C. McKibbin, or no better right than Jeremiah McKibbin, as the surviving partner, the present action could not be sustained. But an assignee in bankruptcy may, in two respects, be able to sustain adversary proceedings where the bankrupt himself could not have done so if there had been no bankruptcy. In one of these respects, the assignee can sue to annul, set aside, or avoid acts which the bankrupt law makes void or voidable. In the other respect, he can sue to avoid or annul, or set aside, any act which, under the general law of debtor and creditor, is void or voidable as against creditors. In the present case, there has not been any act which the bankrupt law makes void or voidable, unless it would be so under the general law of debtor and creditor. But under the general law, the assignee represents the general body of the creditors; and may sue adversarily where the bankrupt himself could not. So far as may be necessary to annul or set aside, any act, in whole or in part, actually or constructively fraudulent as against the creditors, the assignee thus represents them. I say actually or constructively fraudulent, because there may be acts which would be perfectly justifiable on the part of a person who is not insolvent, but are fraudulent, as against creditors, when they have been done by an insolvent or an embarrassed person.

A great deal of the evidence on both sides bore upon the question, whether, upon the retransfer by the sons to the father, there had been a sufficient change of possession. As against creditors, a change of a debtor's ownership, without a change of the possession, does not protect moveable property against his creditors. But the law does not, in this respect, exact what is impossible. If such change as the nature of the subject admits of is fairly made, nothing more is, in general, required. In the present case, if the jury find, that, according to this rule, there was a sufficient change of possession in fact, the court cannot say that it was insufficient in law. On the contrary, the court cannot perceive that anything which ought to have

---

[2] This third count alleged property in the plaintiff and a conversion by the defendant to his own use. A date was erroneous, but being stated under a videlicet, the error was immaterial.

[3] These points were stated and answered by the judge at the outset of the charge. The six propositions, and the answers, are transposed because they will be more intelligible here to a reader who was not present at the trial.

been done was omitted. There was a public advertisement in the newspapers. The title or heading in the register was changed, and the bill heads were changed. Nothing more could be done, unless a circular notice were sent to all persons who had previously dealt with the hotel or its proprietors. The business of a hotel does not seem to be such as to require such a notice, or even to admit of it. But the question is wholly for the jury. It is true that Jeremiah McKibbin remained in the hotel; and he may have been the apparent and actual superintendent of the business. But the supreme court of the state has decided, that this may consist with an assumption of actual and apparent control by the new proprietor; and it is for the jury to determine whether the actual and apparent possession and control were not in Chambers McKibbin. If the case depended upon this question, I should not expect a verdict for the plaintiff.

The remaining inquiry is upon the effect of what was done between the father and the sons to deprive the creditors of the sons of the surplus value of the lease, good will, business and contents of the hotel above the amount of the six notes for together $30,000, and the interest on them which made this debt about $36,000. If you find the question of possession in the father's favor, as I assume that you will, I see no difficulty in his right to receive full reimbursement of this amount out of the property.

The other questions are, first, whether, upon the merits, he was the absolute owner of the property, so as to have a right, as against creditors, to keep the surplus for his own use; and secondly, a technical question, whether, if the merits are with the plaintiff, he can recover in the present form of action.

In considering the first point, it may be premised that the defendant, as between himself and his sons, had a right to this surplus, not under the sale or arrangement of 1865—though this, perhaps, may be immaterial—but, under the retransfer of 1868, which was, in form, absolute. If the sons had not been insolvent, or embarrassed, when the retransfer of 1868 was made, they could have done as they pleased with what was their own. But persons who are insolvent, or embarrassed with debts which they cannot pay, cannot bargain with one creditor so as to defeat any just right of other creditors. This proposition, as it will be applied hereafter, does not depend upon the bankrupt law, but upon the general law of debtor and creditor. We may now go back to the original sale of February 1, 1865, in order to determine what were the defendant's rights under it. The most favorable view of the case which he can reasonably ask you to take is, that he may stand, in all respects, on the same footing as if he were not the father of the debtors, or in any relation of consanguinity to them. That he should stand, as against creditors of the sons, on any better footing, would

shock every man's moral sense of propriety. But he should not stand on a worse footing than any other person who had made just such a contract with them on the 1st of February, 1865. He deposes, in effect, that the sale was made to them for three-fifths only of the then value of the property. He says that it was worth $50,000 to a stranger; but for the reasons which he states, he let them have it for $30,000. The subsequent articles, which all three of the parties executed, recite that in the event of default in payment of the notes, it was agreed that upon his request the premises should be reconveyed. This important contract was verbal. If written it might have been expressed as follows: Chambers McKibbin, proprietor of the lease, good will and fixtures, and furniture and effects of all kinds of the Merchants' Hotel, the same being of the value of $50,000, in consideration of his natural love and affection for his sons, Jeremiah and William C. McKibbin, and of thirty thousand dollars payable in six instalments, for which they have given him their promissory notes, each for $5,000, one of them payable in twenty days, and the other five payable with interest, in six, twelve, eighteen, twenty-four and thirty months, respectively, and for divers other good causes and considerations him thereunto moving, sells and transfers the same to them; and it is agreed, that in the event of a default in payment of the said notes, the said premises shall, at the request of the said Chambers McKibbin, be reconveyed. Now, such an agreement would be the most natural and proper and honest that, with the motives of the elder Mr. McKibbin, could have been executed. And if there had been a writing it would probably have been expressed as I have supposed it, except that the words of the value of $50,000, would probably not have been inserted. But though not inserted, the value would have been provable upon the question which we are about to consider; and, if material to the question, would have been of the same effect as if inserted. To simplify the question, I have therefore supposed it inserted, taking the defendant's own estimate of the then value. The legal or equitable effect would have been the same if the value inserted was $42,000, or any other amount in material excess of the consideration.

This excess in value simplifies the question, what was the effect of the agreement that in case of default, the premises were, upon the seller's request, to be reconveyed. The meaning and effect of such an agreement was that he was to retain them as a security for the $30,000, with interest, just as if they were mortgaged to him, and that if default should be made, he might, upon request, insist upon having possession of the premises restored to him, to hold them as a security till paid, or to be sold in order to effectuate the security. But he could not enforce the literal execution of the agreement to reconvey, in the sense of excluding the debtors from a right to redeem

the premises. He might, after a reasonable notice to the debtors, have sold for the payment of the $30,000, with interest; and the debtors would then have received the surplus. Whether he could have sold without the decree of a court, is an unimportant inquiry. So, it is not important to inquire whether he could have obtained a judicial decree limiting the time within which they might redeem. It is not necessary to answer every question as what he might have done without the consent of the debtors. It suffices to state what he could not have done. He could not have arbitrarily taken the law into his own hands, and compelled an absolute retransfer, according to the literal meaning of the words. He could no more have done so than the payment of the pound of flesh could be enforced literally by Shylock. This may be explained by considering the nature of a mortgage, not that of a pledge distinctively so called, nor the very peculiar case of stoppage in transitu, which has been supposed and argued by counsel. Whether there would have been any difference in the case of a pledge, it is not necessary to inquire. I do not know that there would be. But let us consider the case of a mortgage properly so called. When I say "properly so called," I do not refer particularly to any form of conveyance. I mean simply a security for a debt, where the debtor, and not the creditor, has possession of the property which constitutes the security, till default, and where, upon default, the creditor may take possession. When such a security is written, the form of the writing is unimportant. Sometimes the form is wholly different from the effect. My house may be worth $5,000. I may borrow $500 for a year on the security of the house, and mortgage it to the creditor. The ordinary form of the transaction is, that I give my bond in $1,000, conditioned to pay the $500 with interest; and I convey the house to the creditor to be held by him forever, provided that if I pay him the $500, with interest, within the year, the conveyance shall be null and void, and in that case I shall have back my house; or the mortgage may expressly provide that it shall be reconveyed to me. Here I may continue in possession of the house till I make default, though the mortgage purports on its face to convey the house at once to the creditor. If I make default, he may demand possession; and I must give it up. But if he takes possession, though the mortgage says that it is absolutely his house, in consequence of my default, yet it continues to be my house, though I have made the default; and he holds the possession of it only as a security for his $500 with his interest. As soon as he has received that amount from the rents or profits of the house, he must surrender the possession to me. Ordinarily, a creditor would not embarrass himself by taking possession, but prefers instituting proceedings to compel a sale of the house. This is ordinarily a sale by the sheriff under legal proceedings. But the mortgage may contain a power enabling the creditor to sell, and then legal proceedings may be dispensed with. But whether he sells, or the sheriff sells, he gets only his $500 with interest; and if the sale is for $5,000, or for any less sum, he gets no more, and I get the rest of the money, less costs. I get this money, as proceeds of the sale of my house, and not of his house, though, according to the words of the mortgage, it has been his house all the time.

Now, it is unimportant what may have been the form of the writing, if it was intended as a security for money. And it is a settled rule that the debtor cannot, at the time of the mortgage, make a contract relinquishing, or one which will bind him to forfeit or lose, his right to have the property back, or to redeem it, on payment of the debt with interest. If he could bind himself by such a contract, there would be no limit to extortion except that of the rapacity of the creditor; and the debtor and creditor between them, could cut off all other creditors from any recourse to the surplus value of mortgaged property.

Gentlemen, I said a little while ago that no contract can be made at the time of a mortgage by which the debtor can so give up his right to redeem that he will lose it. And here I will read a passage from Butler's Notes to Coke upon Littleton, because they are the catechism of young lawyers and a safe text for old lawyers; and because the passage states a most familiar and elementary proposition. Butl. Co. Litt. 205a, note 1; "As to what constitutes a mortgage;—no particular words or form of conveyance are necessary for this purpose. It may be laid down as a general rule, and subject to very few exceptions, that wherever a conveyance or assignment of an estate is originally intended as a security for money, whether this intention appear from the deed itself, or by any other instrument, it is always considered in equity as a mortgage, and redeemable, even though there is an express agreement of the parties that it shall not be redeemable, or that the right of redemption shall be confined to a particular time, or to a particular description of persons." In one of the cases which he cites (1 Vern. 8) the register's book contains a declaration of Lord Nottingham, that certain deeds, "being but a security, the same could not be extinguished by any covenant or agreement at the time of making the mortgage." This has never been disputed; and it is not now disputed here. But in order to find out what is disputed, it is sometimes necessary to state what is indisputable. Thus far, there is no dispute.

Where the transaction is a sale, and the purchase money is to be secured in whole or in part, upon the property sold, there may be two writings, one of them a transfer, and the other a mortgage,—or the instrument

making the transfer may reserve or declare the security. In the latter case, one writing answers the purpose of both, and has the same effect as in the case of a writing made between these parties in the form which I have supposed. We may take the case of a writing made on the 1st of February, 1865, in the words in which the articles of the 11th of June, 1868, recite the agreement of the 1st of February, 1865, to have been made. If the agreement was, that the defendant should be secured upon the premises for the payment of his notes, with interest, the effect of this agreement was not such as to give him any different right than if the security had been in the form of a mortgage.

But it has been very ingeniously argued, that there may be a sale of such a kind that the whole consideration or price may be secured by a provision which will so take effect, that, if default is made in payment, the parties are remitted to their former relations, the property revested in the seller, and the debt for the price extinct. I will not say that there cannot be such a case. There may be exceptions from the general rule; and I will not say that there may not be just such an exception as the argument suggests, though I have some difficulty in admitting it, except where the sale has been a conditional one of such a kind as to prevent, suspend or qualify the vesting of the property in the purchaser. But, supposing that the case may be possible, in the abstract, the present is not one of the kind. The right of resumption was here in the creditor alone, without any reciprocity. This brought the case within the general reason of a mortgage. If this difficulty could be overcome, there was another one of a more serious kind. This was, that the consideration was materially less than the full value of the property. In such a case it is of the essence of the transaction that it should be deemed a mortgage.[4] If it be said that the surplus value was a conditional gift from the father to the sons, or from the creditor to those who became his debtors for the price, the objections are, first, that such is not the apparent effect of the contract, and, secondly, that such a contract, as it is said to have been carried into effect, could not have taken effect so as to impair the rights of other creditors. A sale of a subject of commercial business cannot be so made as thus to give, as to two-fifths of the value, an indefinite prospective exemption from liability to creditors. A stranger cannot do it; and of course a father cannot. He cannot give to his sons property to enable them to engage in commercial business, and exempt any part of the property, or any part of its value, from future liability to other creditors. So far as a creditor's own interest is concerned he may in-

dulge his debtors; but he cannot so indulge them as to make two-fifths of the value of the subject of a transfer to them exempt from liability to demands of other creditors. If this were, in any case, doubtful, the exemption certainly could not be indefinitely protracted in duration, as was here attempted. The prospective immunity would be contrary to the nature of the ownership of such a subject. If the equity of redemption could otherwise have been bargained away, as between parties, such a bargain would be of no effect as against other future creditors.

The question of the defendant's alleged absolute ownership is thus reduced to a single point. It depends upon the effect of the articles of the 11th of June, 1868. I have already said that, as between the parties, these articles did vest the absolute ownership in the defendant; and that if the adversary rights of creditors were not in question he could have held the property from that time, as against the sons; and, of course, he could have kept the proceeds of sale, though they might have exceeded the amount of the debt secured. The simple reason is, that—except as against creditors—parties of full age can, as far as their own interest is concerned, do as they may please. But these two gentlemen, the sons, were then, as counsel on both sides concede, insolvent, at all events very much embarrassed, sufficiently so not to be the absolute masters of their property as between themselves and their creditors; because, gentlemen, a man who is indebted, and unable to pay, cannot, as against his creditors, part with his property, under the name of a sale, at an under-value, so as to give away the surplus value, to a father, a son, a friend, or a favored creditor.

It has been argued by counsel, with great zeal and ability, that we may here avoid meeting this question. Why anybody should wish to avoid it I do not see. But the argument is, that because the debt of the sons for the price amounted, with the accrued interest, to $36.000, and the defendant finally sold out for $42,000, the difference being, it is said, only $6,000, therefore, this might be considered as equivalent to a seller's taking back the thing sold at a price about equal to the value, and that the question of the materiality of a difference of $6,000 might therefore be left for you, gentlemen of the jury, to speculate upon, as to the general honesty of the whole transaction. So I understand the argument. But gentlemen, recollect that we are considering the question of honesty, not speculatively as between near relations, but practically as to adversary creditors. I do not understand the reasoning upon the immateriality of a difference of $6,000, if it, in truth, were the whole difference. The amount is not, in itself, small. The dividend upon it might keep a creditor from starving. Nor is a sixth of the amount of the debt with interest an addition proportionally small.

---

[4] The Pennsylvania authorities on the whole subject are reviewed in Thompson v. Hanson, 29 Leg. Int. (March 22, 1872,) 93, and in the note to a fuller report of the same case, in 20 Am. Law Reg. (11 N. S.) 680, 690.

I do not think that you will be readily disposed to think it so. But if you were disposed to view the argument more favorably, I do not think the facts warrant even the statement of the proposition. Mr. McKibbin, when he finally sold out, had already kept this property for almost a year. He had, in this period, according to the evidence, received from it at least $15,000 before he sold. The profits for the year, according to some of the evidence, may have been $24,000, or more. They were, according to his own lowest figure, $15,000. He said, as you will recollect, that the yearly value was never less than $15,000 or $20,000. Now he could, as I have already intimated, after a reasonable notice to redeem or perhaps without any such notice, have sold out sooner than he did. Had he done so, he would have been accountable for a less amount of accrued income, in reduction of the debt. Yet he did not choose to sell sooner. He kept the property until he had received, say $15,000, if you so find. Therefore it is not, as the argument supposes, $6,000 only which he asks to retain over and above his own debt, as against the general creditors. He asks to retain against them in addition to the full amount of his own debt, a year's income in addition to the $6,000. Therefore, if the proposition could otherwise be considered more favorably than I can view it, the facts do not sustain its applicability.

Let us now apply the principles which have been stated. Mr. McKibbin the elder being entitled to the repossession of this hotel for the security of a debt of $30,000, with, say $6,000 interest, making it $36,000, repossesses himself; and having, while repossessed, received a clear income from it of, say at least $15,000, sells for $42,000 more, making at least $57,000. If he is entitled, as I think he is, to retain the $36,000, he has in hand $21,000 more. which, so far as I can see, does not equitably belong to him in any way. I do not impute bad motives to any body. But these gentlemen have taken a wrong and arbitrary view of the subject which is against the just rights of the creditors.

I said, in an earlier stage of my remarks, that any other debt of the sons, or of either of them, to Mr. McKibbin, than the $30,000, with interest, had nothing to do with this case, and should be excluded by the jury from consideration. He says, indeed, that each of them was indebted to him when he sold the hotel to them, and that his expectation then was that if they prospered in the business, they might pay to him those former debts. But there never was any contract which attached those debts to the property. As to any further debts which they may have owed him, when they made the retransfer, he may naturally have supposed likewise that he would be able to retain the surplus avails of the hotel property towards these debts. If so, there was nothing censurable in his motives. But the contract then made was in writing; and it contained nothing appropriating the hotel property to secure any such other debt. Through the intervention of the bankruptcy, it afterwards became impossible for him to set off any such other debt, in any way against the surplus avails. It will be recollected that the title of the assignee in bankruptcy attached, by relation, two days before any sale was made. Until the property was turned into money, there could be no right of retention, or set-off, legal or equitable.

(Under this head, the judge made some remarks upon a supposition that these other debts were all separately contracted by the sons, and were not partnership debts. This part of the charge is omitted because it was afterwards agreed by the counsel, and stated by the judge to the jury, that the sons were, in June, 1868, when the retransfer was made, heavily indebted to the defendant on joint as well as on separate account.)

I repeat that Mr. McKibbin's right of retention was limited to the $30,000 with interest, the amount of the six notes which, as between the sons and himself, were, according to the writing of June, 1868, surrendered.

To recapitulate: The question as to the change of possession, I have left to you, intimating my own impression of the sufficiency of the change. If you find, on this point, in favor of the defendant, it follows that he was entitled to retain, for his own use, the amount of these notes, $30,000 with interest, notwithstanding their extinction as a debt between himself and the sons. Upon the other question, it is for you to determine the value, whether $21,000 more or less, of what he has received and disposed of above the amount of $30,000 with interest. If the plaintiff representing, as he does, the creditors, can sustain their just rights in the present form of action, he is entitled to your verdict for this excess in value. I have no more to say upon the merits of the case.

A point of serious difficulty remains for consideration. upon the technical objection which is made to the action, in its present form. The question whether it could be supported had caused me a good deal of thought before Mr. Biddle's very able argument on the subject. I will now decide the question provisionally, reserving it for fuller consideration hereafter. In the meantime you will act upon my present opinion.

It is to be regretted that the plaintiff has proceeded at law instead of suing in equity. In a court of equity, it would not have required more than a few minutes to state the propositions which it has taken me an hour to explain to the jury. All questions of actual or constructive fraud, as well as questions of account, &c., could have been settled in such a court, or before its master, without any technical embarrassment. But the juris-

diction at law, though less convenient, is, to a certain extent, concurrent; and the plaintiff has invoked its exercise. In the present form of action he cannot recover more than the value of the furniture and other corporeal moveable effects. He could not recover in this action the profits received by the defendant or any part of them, or the value of the good will, if the defendant was liable to any extent under either of these heads. Therefore, though you should believe that the defendant has received more than the value of the furniture and other corporeal effects over and above the amount of the debt, you cannot find a verdict in the plaintiff's favor for the excess. Whether you can find in his favor as to the corporeal effects, depends technically upon another question. This question is, whether the defendant has wrongfully converted them to his own use. Unless he has done so, the plaintiff cannot recover at all. Then what is such a wrongful conversion by the defendant? If, having received clear profits to the amount of $15,000 and more, he had sold the lease and good will separately for $21,000, and had afterward disposed of the corporeal effects for $21,000, this question would have been attended with no difficulty. The debt would then have been paid in full before the disposal of the corporeal effects; and the disposal of them would have been a wrongful conversion. But the good will and corporeal effects were disposed of together for a single price; and there was no apportionment of this consideration, that is to say, there was no sale of the good will at a certain price, and of the corporeal effects for the rest of the consideration. Here the defendant's counsel, with great ingenuity and perfect fairness, argues thus: He says that the subjects of the sale, the good will, and the corporeal effects, were properly sold together, and that they could not have been sold separately without a sacrifice of each. The defendant, in order to render the security available to the best advantage, had a right to sell them together; nay, could not properly have sold otherwise, because to sever them would have injured the sale of each. The argument, then, is that the disposal as made, was not a wrongful act, and consequently not a wrongful conversion to his own use. This is very fair logic. But it may admit of an answer. I think that the argument does not cover the whole of the technical question. The part omitted arises from the adversary relation of the defendant; and is a proposition upon which the question of conversion has, if I am not mistaken, very often depended. Every person who is in possession of property, claiming an exclusive right in himself to the whole of it, has a possession which is adverse against every one else. The defendant's possession being thus wholly adverse to the plaintiff's rights, the proposition is that the defendant made the lumping sale in question for a pur-

pose wholly adverse. This he did if he made it with an existing intent to appropriate the whole avails to his own exclusive use. On this point, all the evidence, in which his subsequent acts and omissions might, if it were necessary, be included, shows, beyond dispute, that his only purpose was appropriation of the whole for his own benefit. If so, the sale was, I think, a wrongful conversion of the furniture and other corporeal effects to his own use. If the good will and corporeal effects were, as Mr. Maugle testifies, of equal value, each worth $21,000, and the defendant made no distinct appropriation of either, I think that, as he could not retain both, the plaintiff might elect for which he would sue; and that this action was an election, the conversion having occurred before the suit, and after the time to which the plaintiff's title related. (As to the right of an assignee in bankruptcy to sue in trover for a conversion occurring before his appointment, but after the time to which his title had relation, the judge referred the counsel to Garland v. Carlisle, in the English house of lords,—4 Clark & F, 693,—and the authorities reviewed in that case).

According to my present opinion, there is no technical obstacle to prevent the plaintiff's recovery of the value of the corporeal effects, as damages for this conversion. The point, however, is reserved, as I have stated. This will not embarrass the jury, who will understand that it is decided, so far as they are concerned, in the plaintiff's favor. If you find for the plaintiff to the extent of this value, taking either Mr. Maugle's estimate of $21,000, or any other estimate that you may think more conformable to the evidence, your verdict will be for the plaintiff on the third count of the declaration, and for the defendant on the other counts. You may add interest for three years and a half, if you think it right, not in the ordinary sense of interest, but as a reasonable measure of damages for the detention.

The jury, not agreeing, were discharged, the judge telling them that they had made a mistake in not finding a verdict. The following are understood to have been his reasons for discharging the jury: The issues in the cases reported in 14 P. F. Smith [64 Pa. St.] 352, were upon sheriff's rules of interpleader. The levies had been made in September, 1868, on the same furniture, &c., which is the subject of the present action, under executions against J. & W. C. McKibbin. Their father, the present defendant, was the claimant. The levies were thus made eight months before he disposed of the property, and at a time when the greater part of the debt to him for the original price was unpaid. His right to retain the property till he should be paid, was thus unquestionable, as against the execution creditors, unless there had been either actual fraud, or insufficient change of possession. The

only contention therefore, under those issues, was upon those two questions, the first, of actual fraud, the second of constructive fraud on the point of possession. In the present case it was evident that the parties on each side came to the trial prepared for the contestation of the same two questions only, and principally the question of possession. But another question of constructive fraud had, in the meantime, arisen upon the defendant's adverse claim of more than a security for the debt. The latter question was apparently overlooked at the trial, until suggested from the bench as necessarily presented by the evidence. Until a late stage of the trial, the plaintiff's contention was upon the two former questions only; and the evidence on that side had apparently been adduced for its bearing on them only.

The evidence of the amounts of the defendant's receipts and expenditures, while he was in possession, was therefore indistinct; as was likewise the proof as to the value of the corporeal effects. The excess of the apparent amount of actual profits above the defendant's estimate of the former annual value, seemed also to require explanation. It might perhaps be conjectured that the difference arose in whole or in part, from his deducting a reasonable allowance for the time and services of himself and members of his family which did not appear upon the books of account. But this could only be a matter of conjecture. If these considerations had been out of the question, the judge, on being informed of the jury's difficulty in agreeing, might probably have directed a verdict in favor of the plaintiff—subject to the point reserved—for the value, without interest, of the corporeal effects, according to the lowest estimate in the testimony—unless the plaintiff had objected to such a direction.